IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:12-CR-170-H-2
NO. 5:13-CV-342-H

| | |
|---|---|
| DECARLOS ANTONIO WRIGHT, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) **MEMORANDUM & RECOMMENDATION** |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

This matter was referred to the undersigned on October 8, 2013 [DE-188], for an evidentiary hearing and memorandum and recommendation regarding Petitioner's claim of ineffective assistance of counsel asserted in his motion to vacate sentence pursuant to 28 U.S.C. § 2255. A hearing on the matter was held on November 14, 2013 [DE-192], and the matter is now ripe for decision.

## I. BACKGROUND

On May 17, 2012, Decarlos Antonio Wright ("Wright" or "Petitioner") was indicted in a multiple defendant indictment by the grand jury in the Eastern District of North Carolina and charged with conspiracy to possess with the intent to distribute and to distribute 280 grams or more of cocaine base (crack) and 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One), distribution of 28 grams or more of cocaine base (crack), aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts Three and Four), distribution of a quantity of cocaine, aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts Five and Six), and possession with intent to distribute a quantity of cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count Eight). [DE-1]. On October 15, 2012, pursuant to a plea agreement

[DE-106], Petitioner pleaded guilty to conspiracy to possess and intent to distribute a quantity of cocaine base (crack) and cocaine (Count One). [DE-105]. On January 9, 2013, the court held a sentencing hearing whereby the court granted the government's motion under U.S.S.G. § 5K1.1 and sentenced Petitioner to 158 months' imprisonment with five years supervised release. [DE-129].

On May 10, 2013, Petitioner filed a motion to vacate his sentence under 28 U.S.C. § 2255 alleging that his trial counsel was ineffective in failing to file a Notice of Appeal, inconsistent with Petitioner's instructions. [DE-145]. The government responded by filing a motion for an evidentiary hearing. The district court granted the government's motion for a hearing and referred this matter to the undersigned to conduct an evidentiary hearing as to whether Petitioner instructed his attorney to file an appeal. On July 29, 2013, the government filed a Motion for New Judgment, seeking the district court to enter a new judgment from which Petitioner may file an appeal and dismissing without prejudice Petitioner's motion to vacate. [DE-175]. In the motion, the government indicated that it was not conceding that counsel failed to file an appeal after Petitioner's request to do so. Petitioner did not respond to the motion. On October 8, 2013, the district court denied the government's motion for new judgment, finding it could not grant the requested relief without first making a finding that counsel failed to file the requested appeal and thereby granting Petitioner's motion to vacate. [DE-188]. The district court re-referred this matter to the undersigned to conduct an evidentiary hearing as to whether Petitioner instructed his attorney to file an appeal. *Id.*

## II. STATEMENT OF THE FACTS

On November 14, 2013, the undersigned held an evidentiary hearing to consider whether Petitioner's counsel provided ineffective assistance in failing to file an appeal at the request of Petitioner. At the hearing, testimony was received from Petitioner, Petitioner's girlfriend, Tiffany

2

McNeill ("McNeill"), and Petitioner's counsel at sentencing, Richard Croutharmel ("Croutharmel").[1]

## A. Wright's Testimony

Petitioner Decarlos Wright testified as follows at the evidentiary hearing. Wright was represented by attorney Richard Croutharmel, by appointment, in his felony criminal case. Croutharmel, following his appointment, visited Wright in jail in Elizabeth City to discuss the government's plea offer. At this meeting, Croutharmel reviewed the plea agreement with Wright which contained an appeal waiver, a plea of guilty to count one of the indictment, and a list of the statutory penalties assessed to the count one conspiracy charge. Wright testified that he ultimately signed the plea agreement and pleaded guilty to count one of the indictment at his arraignment in October 2012. At sentencing on January 9, 2013, Wright received a sentence of 158 months' imprisonment, a sentence below his advisory guideline range due to the government's § 5K motion which the court granted.

Wright acknowledged that the court informed him at the conclusion of the sentencing hearing that he could file an appeal within fourteen days of the judgment being entered. Wright did not have a conversation with his attorney at the conclusion of the sentencing hearing or anytime on the day of the sentencing hearing to notify Croutharmel that he wished to appeal his sentence. Wright never saw or spoke with Croutharmel after the sentencing hearing. Wright spoke with his girlfriend Tiffany McNeill in the days following the sentencing hearing and, at Wright's direction, McNeill attempted to contact Croutharmel a couple of times following the sentencing hearing. Wright testified he did not know the specific dates on which McNeill attempted to contact Croutharmel, but

---

[1] At the hearing, the government made a motion to sequester witnesses during the hearing. The court granted the motion.

estimated that it was approximately one week after Wright's sentencing hearing and that contact was attempted through phone calls and emails. Croutharmel first responded to McNeill sometime after Wright was incarcerated in Hoke County Jail before being transferred to federal prison.[2]

B. **McNeill's Testimony**

Petitioner's girlfriend, Tiffany McNeill, testified as follows at the evidentiary hearing. McNeill is Petitioner's girlfriend of seven years. She was present at Wright's sentencing, but was not present during conversations between Croutharmel and Wright. At the conclusion of the January 9, 2013 sentencing hearing, McNeill, along with Wright's sister and mother, spoke with Croutharmel in the hallway of the courthouse and asked him questions concerning what action needed to be taken for Petitioner to effectively appeal. Wright was not present during this conversation as he had already been taken into custody following sentencing. According to McNeill, Croutharmel offered vague answers to their questions about filing an appeal and never informed McNeill or Wright's sister of the fourteen day appeal period during their conversation. McNeill testified further that Croutharmel informed them to contact the prosecutor concerning an appeal. Wright's sister subsequently attempted to contact some unidentified individuals concerning Wright's appeal.

McNeill testified that she spoke with Wright approximately two days following the January 9 sentencing hearing regarding an appeal. Wright instructed her to contact Croutharmel and she made several telephone calls to Croutharmel's office, as early as two to three days following the sentencing hearing, to find out what needed to be done about an appeal of Wright's case. Each of her calls to Croutharmel reached Croutharmel's voicemail and McNeill left a message each time.

---

[2] Wright did not testify as to whether the conversation between McNeill and Croutharmel occurred within or outside the fourteen day appeal period.

4

McNeill testified that she stated in her voicemail messages that she was calling in regards to or reference to Wright, and that she needed to know what to do about Wright's appeal. After hearing no response from Croutharmel, McNeill sent an email to Croutharmel on April 9, 2013, inquiring about an appeal.

C.  **Croutharmel's Testimony**

Croutharmel testified as follows at the evidentiary hearing. Croutharmel has practiced as a criminal defense attorney in the North Carolina courts since 2001 and in federal district court since 2009. Croutharmel has also worked on federal appellate cases since 2009, including many appeals of guilty pleas involving appeal waivers. Croutharmel began representing Wright in August 2012, and first met with Wright on August 28, 2012 in the Wake County Jail. On September 20, 2012, Croutharmel met with Wright regarding the government's plea offer in Elizabeth City, North Carolina while Wright was being held at the Albemarle Jail. At this meeting, Croutharmel provided Wright with an unsigned copy of the plea agreement and read it to him aloud, explaining the plea agreement line by line. Croutharmel testified that based on his appellate experience dealing with appeal waivers, when they reached the portion of the plea agreement containing the appeal waiver, he was particularly careful in explaining to Wright that by signing the plea agreement he would be waiving his right to appeal, except for the few grounds excepted from the appeal waiver. It is Croutharmel's practice to explain the appeal waiver with all his clients. Croutharmel could not recall specifically if he spoke with Wright at this time about the potential sentences he could face for his charged conduct.

Croutharmel next testified that he met with Wright before his arraignment on October 15, 2012, for approximately 15 minutes. At this time, Croutharmel asked Wright if he still wanted to

5

proceed with the plea agreement to which Wright affirmed that he did. Croutharmel testified he did not speak with Wright following the arraignment, but that he next met with Wright on October 25, 2012, along with a federal probation officer in preface to drafting the presentence report. Croutharmel testified that he did not discuss Wright's appeal rights at this time. Croutharmel met with Wright again on December 19, 2012, to review the presentence report and to have Wright identify his objections to the report. Croutharmel subsequently prepared and filed Wright's objections to the presentence report. Thereafter, the government communicated to Croutharmel that it would pursue a § 5K1.1 motion on Wright's behalf if Wright would withdraw the objections. Croutharmel then sent a letter to Wright explaining the government's offer of a § 5K1.1 motion and the merits of continuing with Wright's objections versus withdrawing the objections. Wright instructed Croutharmel to withdraw his objections to the presentence report.

At the sentencing hearing on January 9, 2013, Croutharmel testified that he spoke with Wright briefly before the hearing commenced, but did not identify what was discussed. Croutharmel testified that the court granted the government's § 5K1.1 motion and Wright received 158 months' imprisonment. After Wright was sentenced, the district court informed Wright of his appeal rights and the fourteen day period in which to file an appeal, but Wright did not instruct Croutharmel to file an appeal at this time. Additionally, Croutharmel testified that he did not glean any interest from Wright in pursuing an appeal, that Wright did not speak to Croutharmel at sentencing and that Wright left the courtroom immediately following sentencing. Croutharmel testified that Wright did not seem in a good mood at sentencing and looked like he might be ill when he left sentencing. Croutharmel specifically testified that he did not ask Wright whether he wanted to file an appeal and did not communicate with Wright either at sentencing or anytime thereafter in person or in writing.

Croutharmel assumed that Wright got a "good deal" and that he did not want to appeal. Croutharmel testified that he never heard from Wright during the fourteen days in which to file a notice of appeal.

Following the sentencing hearing, Croutharmel did not communicate in person with any of Wright's family or friends, but received emails from McNeill. Croutharmel testified he received the following emails from McNeill: (1) a January 7, 2013 email pre-dating the sentencing hearing concerning administrative matters regarding Wright's sentencing; (2) a January 17, 2013 email (post-sentencing) asking when Wright "will be leaving" (Gov't Ex. 1); (3) a February 28, 2013 email asking if another individual was "picked up by the feds" (Gov't Ex. 2); and (4) an April 9, 2013 email stating "[Wright] wanted to know would you file a direct appeal on his behalf" (Gov't Ex. 3). All email exhibits reflect that Croutharmel responded to McNeill the same day of receipt. Gov't Exs. 1-3.[3]

Croutharmel indicated that the January 17 email was the first email he received from McNeill following the sentencing hearing. Croutharmel testified that he received no phone calls from McNeill prior to the January 17 email. Further, to his knowledge, Croutharmel did not receive any voicemail messages concerning Wright's appeal between the time of Wright's sentencing and the April 9 email. Croutharmel testified that the April 9 email was the first time Wright or anyone on Wright's behalf had indicated that Wright had an interest in appealing his conviction and sentence and there was no communication after this time concerning an appeal. Croutharmel testified that he does not have a secretary at his office and that all office telephone calls are forwarded to his cell phone which has voicemail capability. Croutharmel personally checks his voicemail messages and his office has operated with this type of phone system since he began his practice.

---

[3] All email exhibits were admitted without objection.

## III. LEGAL STANDARDS

### A.     28 U.S.C. § 2255

After conviction and exhaustion, or waiver, of any right to appeal, courts and the public can presume that a defendant stands fairly and finally convicted. *See United States v. Frady*, 456 U.S. 152, 164-65 (1982). However, 28 U.S.C. § 2255 provides a means for a defendant convicted of a federal offense to collaterally attack a conviction or sentence on four grounds: (1) the sentence was imposed in violation of the Constitution or the laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). "[T]hus § 2255 relief is not limited to constitutional error in a conviction or sentence." *United States v. Mikalajunas*, 186 F.3d 490, 495 (4th Cir. 1999). However, where a petition seeks relief from a nonconstitutional error, "the scope of review . . . is more limited than that of constitutional error; a nonconstitutional error does not provide a basis for collateral attack unless it involves a fundamental defect which inherently results in a complete miscarriage of justice, or is inconsistent with the rudimentary demands of fair procedure." *Id.* "In a § 2255 proceeding, the burden of proof is on petitioner to establish his claim by a preponderance of the evidence." *Toribio-Ascencio v. United States*, Nos. 7:05-CR-00097-FL, 7:08-CV-211-FL, 2010 WL 4484447, at *1 (E.D.N.C. Oct. 25, 2010) (citing *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958)).

### B.     Ineffective Assistance of Counsel

The analysis of an ineffective assistance of counsel claim requires application of the two-part test established by *Strickland v. Washington*, 466 U.S. 668, 690-94 (1984). First, the petitioner must show that his counsel's performance was deficient in that it fell below the standard of reasonably

8

effective assistance. *Id.* at 687-691. Second, the petitioner must show that there is a reasonable probability that, but for his counsel's errors, the result of the proceeding would have been different. *Id.* at 694. In *United States v. Peak*, the Fourth Circuit held that if a client instructs his attorney to file an appeal, and the attorney fails to do so, the attorney's actions constitute ineffective assistance, notwithstanding the likelihood of success on appeal. 992 F.2d 39, 42 (4th Cir. 1993). Further, a waiver of appellate rights in a plea agreement does not absolve counsel of this duty. *United States v. Poindexter*, 492 F.3d 263, 271-73 (4th Cir. 2007).

Moreover, even if the defendant fails to clearly instruct counsel to file an appeal, counsel must consult with the defendant about an appeal under two circumstances. *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000). This duty to consult arises "when there is reason to think either (1) that a rational defendant would want to appeal . . ., or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. *Id.* at 480. In determining whether counsel has a constitutional duty to consult, the Supreme Court has provided the following guidance:

> Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal.

*Id.* Counsel's duty to consult with the defendant contemplates "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." *Id.* at 478. The Fourth Circuit has held that such consultation should occur

9

after sentencing. *See United States v. Witherspoon*, 231 F.3d 923, 927 n.4 (4th Cir. 2000); *see also Miller v. United States*, 150 F. Supp. 2d 871, 880 (E.D.N.C. 2001) (interpreting *Witherspoon* to strongly suggest that advice about appeal should be given after sentencing). "If counsel has not consulted with his client, the court must then ask whether the failure to consult itself constitutes deficient performance." *Witherspoon*, 231 F.3d at 926 (citing *Roe*, 528 U.S. at 478-79). Finally, the defendant must show prejudice, i.e., "a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Id.* at 484.

## C.     Legal Standards for Determining Credibility

"In assessing the credibility of witnesses, trial courts consider 'variations in demeanor and tone of voice.'" *Rahman v. United States*, No. 7:08-CR-126-D, 2013 WL 5222160, at *5 (E.D.N.C. Aug. 27, 2013) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985)), *report and recommendation adopted*, 2013 WL 5230610 (E.D.N.C. Sept. 16, 2013). "In addition, '[d]ocuments or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.'" *Id.* (citing *United States v. Marcavage*, 609 F.3d 264, 281 (3d Cir. 2010)). "Additional considerations can include the witness's motive to lie and the level of detail in the witness's statements." *Id.* (citing *United States v. Wilson*, 624 F.3d 640, 665 (4th Cir. 2010)).

## IV. ANALYSIS

## A.     Wright Did Not Instruct Croutharmel to File an Appeal

Wright contends that Croutharmel failed to file an appeal as instructed by Wright. [DE-145] at 4. Therefore, the court first considers the factual issue of whether Petitioner instructed

10

Croutharmel to file an appeal. Here, Wright's claim is not based on his own direct communication to Croutharmel requesting an appeal because, by Wright's own admission, he did not personally request Croutharmel to file an appeal at the sentencing hearing or anytime on the day of sentencing, nor did he have any contact with Croutharmel post-sentencing.[4] The court accepts Petitioner's testimony and finds that he did not *directly* instruct Croutharmel to file an appeal on his behalf. Instead, Wright's claim is based on his understanding of McNeill's alleged communications to Croutharmel conveying Wright's interest in an appeal. Wright testified that he instructed McNeill to contact Croutharmel following sentencing and McNeill testified that within fourteen days following Wright's sentencing hearing she left voicemail messages with Croutharmel about an appeal for Wright. As set forth below, Croutharmel's testimony contradicts McNeill's testimony, and the contradicting testimony creates a disputed issue of fact requiring a credibility determination. In sum, the court finds that Wright has failed to show by a preponderance of the evidence that he instructed Croutharmel, either directly or through McNeill, to file an appeal. Instead, the credible evidence establishes that neither Wright nor McNeill expressly communicated to Croutharmel that Wright wanted to appeal.

The court focuses on McNeill's testimony in determining whether Croutharmel was instructed to appeal Wright's case. However, McNeill's testimony that she instructed Croutharmel to file an appeal within the fourteen day period is not credible to the extent it is undermined by Croutharmel's testimony, not supported by the documentary evidence in the form of emails, and undercut by the vagueness of Wright's testimony concerning the matter. Moreover, McNeill's own

---

[4] Additionally, Wright did not testify that he had instructed Croutharmel to file an appeal at any time before the sentencing hearing.

11

testimony concerning her phone calls and voicemail messages lacks the specificity and consistency necessary for the court to credit it. Croutharmel's testimony is found to be credible and persuasive based on his more than ten years of experience as a criminal defense attorney and the documentary evidence submitted to the court which corroborates Croutharmel's testimony.

McNeill testified that she made several phone calls to Croutharmel following the sentencing hearing which Wright contends is the basis for his claim that he instructed Croutharmel to file an appeal.[5] Based on the credible evidence, the court finds that McNeill did not call Croutharmel within the fourteen day appeal period to direct that he file an appeal in Wright's case. Croutharmel testified that he did not receive any telephone calls nor does he recall voicemail messages from McNeill during the fourteen day period and the court credits Croutharmel's testimony on this fact. First, Croutharmel does not have a secretary to take messages at his office. Croutharmel testified that his office telephone system is structured such that telephone calls and voicemails made to his office line are directed to his cell phone which he personally monitors and he has run his law practice this way since he began practicing over ten years ago. This testimony dispels the possibility that McNeill's phone calls or messages were not given to Croutharmel due to a secretary's oversight.

Further, neither Wright nor McNeill testified to the specific instances when McNeill called Croutharmel during the fourteen day period. McNeill testified that she spoke with Wright within

---

[5] McNeill testified that she first spoke with Croutharmel in the courthouse hallway after the sentencing hearing to ask what needed to be done to appeal Wright's case. McNeill's testimony concerning this conversation with Croutharmel provides no assistance to Wright. This conversation happened outside Wright's presence as he had already been taken to the courthouse holding cell post-sentencing. Nothing in the record indicates she was speaking on Wright's behalf or at his direction at this time concerning an appeal. The tenor of McNeill's testimony demonstrates that her conversation with Croutharmel was spurred by her own interest concerning the course of Wright's case post-sentencing. McNeill took issue with the fact that Croutharmel did not inform the family of the fourteen day appeal period during this conversation, but her knowledge of the appeal period is not relevant and Wright acknowledged that the court informed him of the fourteen day appeal period at sentencing.

a couple of days following sentencing regarding his appeal and that she made several telephone calls to Croutharmel two to three days following sentencing, but received no response to her calls. McNeill's inability to provide specifics as to her phone calls limits her credibility on this issue. Also, the government introduced, and the court admitted without objection, a series of emails exchanged between Croutharmel and McNeill post-sentencing which persuades the court that McNeill did not call Croutharmel. McNeill sent an email to Croutharmel on January 17, 2013, at 11:36 a.m. asking Croutharmel "when and where [Wright] will be leaving?" Gov't Ex. 1. Croutharmel responded to McNeill the same day at 1:42 p.m., that he did not know where or when Wright would be moved to a Bureau of Prisons ("BOP") facility and explained that his transfer was determined by the United States Marshals and the BOP. *Id.* McNeill sent a second email to Croutharmel on February 28, 2013, at 1:12 p.m. to ask whether another individual had been "picked up by the feds." Gov't Ex. 2. Croutharmel responded within minutes to McNeill's email. *Id.* McNeill sent a third email on April 9, 2013, at 12:20 p.m. stating the following: "[Wright] wanted to know would you file a direct appeal on his behalf. Please email me back as soon as possible." Gov't Ex. 3. Croutharmel again responded within minutes explaining that the appeal time had expired and Wright's plea agreement contained an appeal waiver. *Id.*

This email correspondence undermines McNeill's credibility and belies her testimony that she timely called Croutharmel informing him that Wright wished to appeal. According to McNeill, she contacted Croutharmel concerning Wright's appeal and was unable to get a response. McNeill testified that she first emailed Croutharmel on April 9 because she was unsuccessful in getting a response to her phone calls, yet the evidence shows she sent two emails in the months before and received a prompt response each time. The promptness of Croutharmel's email responses begs the

13

question of why McNeill did not mention an appeal in any of her previous emails since she was allegedly awaiting a response from Croutharmel concerning that topic and having difficulty contacting Croutharmel. McNeill sent her first email eight days following Wright's January 9 sentencing hearing and received a same day response from Croutharmel, yet the email does not mention the appeal or Croutharmel's failure to respond to her phone calls concerning an appeal. If McNeill called Croutharmel before the January 17 email, it seems implausible that she would contact him about an unrelated matter and not mention an appeal, much less his failure to respond to her calls. If McNeill called Croutharmel after this email, it seems implausible that she would not email him back concerning the appeal or his failure to return her phone calls given his prompt response to her previous email inquiry.

Further, McNeill did not mention the appeal or the lack of response in her February 2013 email, but inquired about a matter unrelated to Wright's case. McNeill finally mentioned a direct appeal for Wright in her April 9 email, approximately three months after sentencing. However, the tone and language of this email does not indicate that McNeill had been unsuccessfully attempting to contact Croutharmel for almost three months to file an appeal. The email conveys that Wright's interest in an appeal is more inquisitive and it fails to demonstrate that Wright instructed McNeill to tell Croutharmel to pursue a direct appeal at an earlier time. The most plausible interpretation of the evidence is that McNeill did not call Croutharmel during the fourteen day appeal period, or otherwise instruct him to file an appeal on behalf of Wright. McNeill's testimony, and for that matter Wright's testimony, is contradicted by credible testimony from Croutharmel that he never received a phone call from McNeill and documentary evidence consistent with Croutharmel's testimony. The documentary evidence showing Croutharmel's repeated responses to McNeill's

14

emails demonstrate his practice is to respond to inquiries from clients or others, making it less conceivable that he deliberately ignored any phone calls or messages from McNeill. In short, these facts appear compelling to the court and lead it to conclude that McNeill did not call or message Croutharmel during the fourteen day appeal period following sentencing.

Alternatively, even if McNeill did call Croutharmel during the fourteen day appeal period, her testimony does not support a finding that the content of the messages informed Croutharmel of Wright's desire to appeal. McNeill's testimony, until a final question from this court in an effort to clarify her testimony, was that her messages to Croutharmel stated that she was calling in reference to or regarding Wright and either needed to talk about Wright's appeal or to learn what needed to be done about an appeal. Her testimony on direct and cross examination by counsel does not indicate that her messages conveyed she was calling *at the direction of* Wright, and not upon her own initiative, or that Wright himself had an interest in appealing.[6] *See United States v. Hyde*, Nos. 4:02-CR-93, 4:07-CV-65, 2008 WL 1809135, at *4 (E.D. Va. Apr. 18, 2008) ("At no point did [the witness] testify that she informed [the defendant's attorney] that Defendant wanted him to file an appeal or that she directed [the attorney] to file an appeal on Defendant's behalf.").

Additionally, Wright's own testimony that he directed McNeill to instruct Croutharmel to file an appeal is vague and not particularly insightful for the court in determining the present issue of fact. Wright never testified to the specifics of his conversation with or instructions to McNeill in contacting Croutharmel. Even though Wright responded to his attorney's question as to how he

---

[6] Following examination by counsel, the undersigned questioned McNeill for several minutes concerning the exact content and wording of her alleged voice mails to Croutharmel. While McNeill made it clear that her messages said she was calling in regards to Wright, she did not make clear that her messages indicated she was acting at Wright's direction because he wanted to appeal.

notified Croutharmel of his desire to appeal, noticeably absent from Wright's testimony is a clear statement as to what exactly he told McNeill to tell Croutharmel regarding his case. Wright testified generally that he told McNeill to contact Croutharmel, but there is no direct testimony that he had an interest in appealing. Accordingly, Wright has failed to carry his burden to show by a preponderance of the evidence that Croutharmel provided ineffective assistance of counsel by failing to file a notice of appeal at Wright's request.

## B. Croutharmel Did Not Have a Constitutional Duty to Consult with Wright

Although the court concludes that Wright did not instruct Croutharmel to file an appeal, the inquiry into whether Croutharmel's performance was deficient does not end there. *Roe*, 528 U.S. at 478. The court must determine "'whether [defense] counsel in fact consulted with the defendant about an appeal.'" *Witherspoon*, 231 F.3d at 926 (quoting *Roe*, 528 U.S. at 478). If counsel did not consult with the defendant then the court must inquire whether counsel had a duty to consult such that his "failure to consult" constitutes deficient performance. *Roe*, 528 U.S. at 478-80.

The evidence shows that Croutharmel did not "consult" with Wright. Croutharmel acknowledged that he did not have a conversation with Wright at any point post-sentencing and did not ask Wright whether he wanted to appeal. *See Mayberry v. United States*, Nos. 5:05-CR-299-FL, 5:07-CV-307-FL, 2008 WL 1902697, at *4 (E.D.N.C. Apr. 29, 2008) (interpreting *Witherspoon* to require that such consultation occur after sentencing). Additionally, Croutharmel's meetings with Wright prior to sentencing cannot be said to constitute consulting as there is no evidence of extensive appeal discussions having occurred which could save the inadequacy of discussions post-sentencing. *See Miller*, 150 F. Supp. 2d at 880 (adopting memorandum and recommendation giving deference to *Witherspoon* and finding that counsel's meeting with petitioner prior to sentencing could not

16

satisfy consulting obligation). Since Croutharmel did not consult with Wright, the court must determine whether Croutharmel had a constitutionally imposed duty to consult. *See Roe*, 528 U.S. at 480 (finding that there is a constitutionally imposed duty to consult when there is reason to think either a rational defendant would want to appeal or defendant reasonably demonstrated an interest in appealing). This court finds that Croutharmel had no duty to consult with Wright about an appeal.[7]

First, Wright did not reasonably demonstrate an interest in appealing. Croutharmel had a total of five in-person meetings with Wright prior to sentencing, at least one of which was no more than fifteen minutes. Apart from the meeting during which Croutharmel reviewed the plea agreement with Wright, Croutharmel did not indicate that he discussed an appeal with Wright at another time. There is no testimony, from either Wright or Croutharmel, indicating Wright expressed an interest in appealing to Croutharmel prior to sentencing or at sentencing. Croutharmel testified that Wright left the courtroom at the conclusion of the sentencing hearing without speaking to him and Wright acknowledged that he never personally spoke with Croutharmel following sentencing. Additionally, the court concluded that McNeill did not call Croutharmel during the fourteen day appeal period expressing Wright's interest in appealing. Finally, McNeill's conversation with Croutharmel in the courthouse hallway after the sentencing hearing, that McNeill testified to, does not reasonably demonstrate Wright's interest in an appeal. The testimony regarding this conversation indicates McNeill and family members hoped something might be done after

---

[7] The court should emphasize that failing to meet with a criminal client after sentencing is not "the better practice" for defense counsel irrespective of this court's ultimate finding that counsel did not violate a constitutional duty to consult. *See Roe*, 528 U.S. at 479 (explaining that while there is no per se duty to consult, the "better practice is for counsel routinely to consult with the defendant regarding the possibility of an appeal").

17

sentencing, but there was no indication that Wright wished to appeal and McNeill was not present for any discussions between Croutharmel and Wright. *See Brown v. United States*, Nos. 7:06-CR-98-2, 7:08-CV-80102, 2009 WL 1789121, at *2 (W.D. Va. June 23, 2009) (finding family members did not request an appeal during conversations with counsel and therefore defendant did not reasonably demonstrate an interest in an appeal); *cf. United States v. Malone*, 442 F. App'x 864, *2 (4th Cir. 2011) (concluding that family member's conversations with counsel "about [defendant's] desire to appeal" support a finding that defendant reasonably demonstrated an interest in appealing). Therefore, Wright gave no indication that he wanted to appeal such that Croutharmel violated a constitutional duty to consult with Wright.

Next, the record demonstrates that a rational defendant would not want to appeal. Wright pled guilty pursuant to a signed plea agreement and waived his right to appeal, except for a few circumstances, in that written plea agreement. *Roe*, 528 U.S. at 480 (stating that a "highly relevant factor . . . [is] whether the conviction follows a trial or a guilty plea, . . . because a guilty plea reduces the scope of potentially appealable issues"). Croutharmel testified that he met with Wright to review the plea agreement and explained the agreement line by line, including the appeal waiver. The plea agreement significantly limited the issues for appeal and there is no indication that the decision to plead guilty was a difficult decision for Wright. Courts have also recognized that plea agreements may indicate a defendant seeks an end to the criminal proceedings, rather than an extended resolution. *Id.* Further, Wright received the conviction and sentence bargained for with the government making it less conceivable that a rational defendant would want to appeal. *See United States v. Matthews*, 384 F. App'x 214 (4th Cir. 2010) (recognizing that the defendant received a sentence below the bottom of the guideline range, thereby supporting the conclusion that a rational

18

defendant would not want to appeal). The court dismissed all counts in the indictment except count one, as provided in the plea agreement, and the court granted the government's § 5K motion at the sentencing hearing, resulting in a sentence well below the computed guideline range.[8] *See* PSR; J. in Criminal Case [DE-129]. Wright withdrew his objections to the PSR in an effort to gain a § 5K motion from the government and was successful in that. Therefore, Wright's expectations as to his conviction and sentence were met and there appear to be no nonfrivolous grounds for appeal remaining.

Based on the foregoing, Croutharmel did not have a constitutional duty to consult with Wright concerning an appeal. Although Croutharmel's failure to consult with Wright post-sentencing would not be the preferred practice, it has not been shown by a preponderance of the evidence that Croutharmel provided ineffective assistance of counsel by failing to consult with Wright.

## V. CONCLUSION

For the reasons stated above, it is RECOMMENDED that the Petitioner's 28 U.S.C. § 2255 claim for ineffective assistance of counsel based on counsel's failure to file an appeal be DISMISSED.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days after receiving it to file written objections. Failure to file timely written objections bars or may bar an aggrieved party from receiving a *de novo* review by the District Court on an issue covered in the Report and, except upon grounds of plain error, from

---

[8] Wright received a sentence of 158 months' imprisonment and 5 years supervised release. The computed guideline sentence range was 210 to 262 months' imprisonment and 5 years supervised release.

19

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

SUBMITTED, this the 11th day of December, 2013.

/s/ Robert B. Jones, Jr.
Robert B. Jones, Jr.
United States Magistrate Judge